James A. Hunter
Hunter & Kmiec
42 Stagecoach Rd.
Piper, PA 18947
**Phone:** 484-437-5935
**Fax:** 646-462-3356
**Email:** hunter@hunterkmiec.com
**Bar:** JH-1910

Daniel E. Doherty
DE Doherty Law Office, LLC
7300 W. 110th Street, Suite 930
Overland Park, KS 66210
**Phone:** 913-338-7182
**Fax:** 913-338-7164
**Email:** ded@ddoherty.net
**Bar:** DD–2145

Miriam Tauber
Miriam Tauber Law PLLC
885 Park Avenue #2A
New York, NY 10075
**Phone:** 323-790-4881
**Email:** MiriamTauberLaw@gmail.com
**Bar:** MT-1979

*Attorneys for Plaintiffs*

# United States District Court
## for the
## Southern District of New York

| | |
|---|---|
| Donna Ann Gabriele Chechele<br>Mark Rubenstein<br>Revive Investing LLC<br>　　　　*Plaintiffs*<br>　　v.<br><br>Pierre Laubies<br>　　　　*Defendant*<br>　　and<br>Coty, Inc.<br>　　　　*Nominal Defendant* | 20–CV–03438 (PAE)<br><br>**Jury Trial Demanded**<br><br>Amended Complaint |

## Amended Complaint

Plaintiffs Donna Ann Gabriele Chechele, Mark Rubenstein, and Revive Investing, LLC (collectively, "Plaintiffs"), by their undersigned attorneys, plead for their complaint as follows:

Introduction

**1.**   This is an action for disgorgement under Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b).

**2.**   Section 16 is the "original and only express 'insider' trading provision[]" of the Act. Richard W. Jennings et al., Securities Regulation: Cases and Materials 1202 (8th ed. 1998). It works to "prevent[] the unfair use of information that may have been obtained by [an insider] by reason of his relationship to the issuer." 15 U.S.C. § 78p(b).

**3.**   The statute applies to the directors and officers of every issuer of a class of publicly traded equity securities. *Id.* § 78p(a), (b). It also applies to every beneficial owner of more than 10% of any such class. *Id.* Under Section 16(b), these "insiders" must disgorge to the issuer any profit they realize from a purchase and sale, or a sale and purchase, of the issuer's equity securities occurring within a period of less than six months. *Id.* § 78p(b). If an insider fails to disgorge this "short-swing" profit, the statute empowers the issuer, or "the owner of any security of the issuer," to bring suit to recover it. *Id.*

**4.**   Liability under Section 16(b) is strict. The profit from a short-swing transaction must be disgorged "irrespective of any intention on the part of [the insider] in entering into such transaction." *Id.* Recovery never depends on proof of scienter, a breach of duty, or the actual misuse of inside information. See Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422 (1972).

**5.**   Plaintiffs, three stockholders of Nominal Defendant Coty Inc. ("Coty"), bring this suit against Coty's outgoing chief executive officer, Defendant Pierre Laubies ("Laubies"). While subject to Section 16 of the Act, Laubies realized hundreds of thousands of dollars in short-swing profit from his purchase and sale of Coty's Class A common stock.  Under Section 16(b), this profit is now Coty's lawful property, which Laubies is strictly liable to account for and repay.

### Jurisdiction and Venue

**6.**  Jurisdiction is conferred on this Court by Section 27 of the Act, 15 U.S.C. § 78aa, and by 28 U.S.C. § 1331.

**7.**  Venue lies in this District under Section 27 of the Act and 28 U.S.C. § 1401 (a) because Coty is found in and transacts significant business in this District, maintaining its principal executive office, and multiple retail outlets, in the County of New York; and (b) because the transaction described in paragraph 16 below was executed through the facilities of the New York Stock Exchange LLC, a national securities exchange registered under Section 6 of the Act, 15 U.S.C. § 78f, and located in this District.

### The Parties

**8.**  Plaintiff Donna Ann Gabriele Chechele is a natural person, a resident of the State of New Jersey, and a stockholder of Coty.

**9.**  Plaintiff Mark Rubenstein is a natural person, a resident of the State of Rhode Island, and a stockholder of Coty.

**10.**  Plaintiff Revive Investing, LLC is a limited liability company formed under the laws of the State of Texas with a principal place of business located in Georgetown, Texas, and a stockholder of Coty.

**11.**  Defendant Pierre Laubies is a natural person and a resident of the State of New York.

**12.**  Nominal Defendant Coty Inc. is a corporation formed under the law of the State of New York with a principal place of business located in New York, New York.  This action is brought in the right and for the benefit of Coty, which is named as a nominal defendant solely to ensure that all necessary parties are before the Court.

3

FACTS

## Background

**13.**  Coty is a publicly traded beauty company with a stable of more than 75 owned or licensed brands, including such household names as Clairol, CoverGirl, and Max Factor.

**14.**  At all relevant times, Coty's Class A common stock has been registered under Section 12 of the Act, 15 U.S.C. § 78l, and listed for trading on the New York Stock Exchange.

**15.**  Laubies joined Coty as chief executive officer in November 2018, serving in that role until his resignation on June 1, 2020.  He also sat on its board from the time of his arrival until his resignation as a director on May 31, 2020.  While serving as a director and officer, Laubies transacted in Coty's Class A common stock as described in the follow paragraphs.

## Laubies's Purchase of Common

**16.**   On August 30, 2019, Laubies purchased 262,000 shares of Coty's Class A common stock on the open market at the price of $9.5418 per share.

**17.**  Laubies reported his purchase on a Statement of Changes in Beneficial Ownership on Form 4 filed with the SEC on September 4, 2019.

## Laubies's Sale of Common

**18.**  Although Laubies stayed on at Coty until the late spring, he had announced his resignation to the board back in February 2020.

**19.**  In anticipation of his departure, Laubies resolved to liquidate his entire equity stake in Coty, including all 3,260,329 of his shares of Coty's Class A common stock.

**20.**  On February 27, 2020, the same day his resignation was delivered, Laubies

entered into an agreement, either written or oral (the "Initial Common Stock Agreement"), with Cottage Holdco B.V. ("Cottage Holdco"), Coty's controlling stockholder.

**21.**  The Initial Common Stock Agreement obligated Laubies to sell 3,260,329 shares of Coty's Class A common stock to Cottage Holdco at a price of $11.4937 per share.

**22.**  The agreement derived this price from the dollar volume-weighted average price of Coty's publicly traded Class A common stock on the New York Stock Exchange during the 15 consecutive trading days ending on February 26, 2020.

**23.**  The parties to the Initial Common Stock Agreement relied on this formula to set their price because they viewed the contemporaneous market price of Coty's Class A common stock as the best proxy for the value of Laubies's shares.

## The Initial Disclosures

**24.**  Laubies disclosed his sale pursuant to the Initial Common Stock Agreement in a Statement of Changes in Beneficial Ownership on Form 4 filed with the SEC on March 2, 2020.

**25.**  The Form 4 reported Laubies's sale with a transaction date of February 27, 2020, and included the following disclosure: "On February 27, 2020, Cottage Holdco B.V. and Pierre Laubies entered into a stock purchase agreement pursuant to which Mr. Laubies agreed to sell, and Cottage Holdco B.V. agreed to purchase, 3,260,329 shares of Common Stock held by Mr. Laubies."

**26.**  Cottage Holdco separately disclosed the Initial Common Stock Agreement in its own Statement of Changes in Beneficial Ownership on Form 4 filed with the SEC on March 2, 2020.

**27.**  The Form 4 filed by Cottage Holdco reported a purchase with a transaction date of February 27, 2020, and included the following disclosure: "On February 27, 2020, Cottage Holdco B.V. and Pierre Laubies entered into a stock purchase

agreement pursuant to which Mr. Laubies agreed to sell, and Cottage Holdco B.V. agreed to purchase, 3,260,329 shares of Class A Common Stock held by Mr. Laubies."

**28.**  At the same time that Laubies and Cottage Holdco were formulating the Initial Common Stock Agreement, Laubies and Coty were formulating an agreement whereby Laubies would sell his shares of Series A-1 Preferred Stock to Coty (the "Initial Preferred Stock Agreement").

**29.**  On the same March 2, 2020, Form 4 Laubies reported the sale of the preferred stock to Coty with a transaction date of February 27, 2020, and included the following disclosure: "On February 27, 2020, Coty Inc. (the 'Company'), Mr. Laubies and Elmfort Invest B.V. entered into a purchase agreement pursuant to which Mr. Laubies and Elmfort Invest B.V. agreed to sell, and the Company agreed to purchase, all of the shares of Series A-1 Preferred Stock held directly and indirectly by Mr. Laubies."

**30.**  On a Form 8-K Current Report, Coty disclosed its entering into the Initial Preferred Stock Agreement with Laubies, in the following language: "Also on February 27, 2020, the Company entered into a purchase agreement (the 'Preferred Repurchase Agreement') with Mr. Laubies, pursuant to which the Company will purchase all of the shares of Series A-1 Preferred Stock held by Mr. Laubies."

**31.**  At the same time the parties were formulating the Initial Common Stock Agreement and the Initial Preferred Stock Agreement, Coty and Laubies were negotiating the terms of Laubies' resignation in an agreement (the "Settlement Agreement") that Coty disclosed in the same 8-K Current Report: "On February 27, 2020, Coty Management B.V. entered into a settlement agreement (the 'Settlement Agreement') with Mr. Laubies in connection with his resignation. Pursuant to the Settlement Agreement, Mr. Laubies will receive the severance benefits provided for under his existing employment agreement as if his employment were terminated for Good Reason, so long as he provides a release and complies with the post-termination employment covenants contemplated by his employment

agreement and the Settlement Agreement."

**32.**  In short, the parties irrevocably committed to the terms of the Initial Common Stock Agreement, the Initial Preferred Stock Agreement, and the Settlement Agreement, including with respect to the number and pricing of shares to be transferred under those agreements, as part of Laubies' resignation tendered on February 27, 2020, irrespective of whether the text of the ancillary provisions had been finalized or not.

### Plaintiffs' Demands and the Revised Disclosure

**33.**  By separate letters of March 2, 2020, Plaintiffs made demand on Coty through their undersigned counsel for recovery of the short-swing profit realized by Laubies from his transactions in the Company's Class A common stock in August 2019 and February 2020.

**34.**  Coty received Plaintiffs' demands and forwarded copies of them to Laubies or his legal counsel.

**35.**  Following these demands, Laubies and Cottage Holdco amended their earlier disclosures of the Initial Common Stock Agreement to change the "as of date" to March 12, 2020 (the "Amended Common Stock Agreement").

**36.**  In an amended Form 4, filed by Laubies on March 16, 2020, he revised the date of the agreement from February 27 to March 12 and included the following disclosure: "The original Form 4 filed on March 2, 2020 is hereby amended by this Form 4/A to correct the transaction reported in Table I. . . . This Form 4/A reflects that the Stock Purchase Agreement (as defined in this Form 4/A) was entered into on March 12, 2020."

**37.**  The amended Form 4 Laubies filed on March 16, 2020, did not revise the price, quantity or any other terms of the sale originally disclosed on March 2, 2020. The transaction date was the only term changed.

**38.**  Laubies' amended Form 4 did not restate the date of the Initial Preferred

Stock Agreement, even though later disclosures indicate that its effective date was changed from February 27 to March 12 as well. The date of the Initial Preferred Stock Agreement had no implications for Section 16(b).

**39.** Coty also did not amend its Current Report on Form 8–K filed on February 28, 2020, to change the effective date of either the Initial Preferred Agreement or the Settlement Agreement.

**40.** Within minutes of the filing of Laubies's amendment, Cottage Holdco filed a parallel amendment to its own Form 4 originally filed on March 2, 2020. Cottage Holdco's amendment restated the date of the Initial Common Stock Agreement in lockstep with Laubies's amendment and included the following disclosure: "The original Form 4 filed on March 2, 2020 is hereby amended and restated by this Form 4/A. This Form 4/A reflects ⋯ that the Stock Purchase Agreement (as defined in this Form 4/A) was entered into on March 12, 2020."

**41.** By revising the date of the Initial Common Stock Agreement from February 27 to March 12, the amendments placed Laubies' sale of 3,260,329 shares more than six months after his August 2019 purchase. As a result, the two transactions could no longer be "matched" under Section 16(b) of the Act.

### Plaintiffs' Further Investigation

**42.** When confronted about the amendments, Coty's legal counsel explained that the Initial Common Stock Agreement had not been fully executed until March 2020. According to Coty, Laubies had simply overlooked signing the agreement in February.

**43.** Plaintiffs' counsel pointed out the implausibility of this explanation in light of the two Forms 4 originally filed on March 2, 2020. It seemed unlikely that not one but both counterparties to the Initial Common Stock Agreement would have reported "enter[ing] into" the agreement "[o]n February 27, 2020" when one of them had not signed it until March.

**44.** After further discussion with his client, Coty's counsel informed Plaintiffs' counsel that Laubies's unsigned counterpart had not been overlooked after all. Instead, Laubies had deliberately withheld it for two weeks because he was unhappy with the draft terms of a tax indemnity Cottage Holdco had negotiated.

**45.** This explanation was even more implausible than the first. While it seemed unlikely that both parties to the Initial Common Stock Agreement would over-look an unsigned counterpart, it was perhaps more implausible that they would mistake the agreement as fully executed, and file reports with the SEC on that assumption, while they were still negotiating important terms of the agreement.

**46.** Coty also could not adequately explain why Cottage Holdco made no effort to renegotiate the sale price for Laubies's stock when the parties were still dickering over material terms as late as March 12, 2020. Even though the agreement was supposedly signed on March 12, it still valued the shares based on their market price over the 15 trading days ending on February 26.

**47.** The outdated pricing formula had a big impact on the parties' bottom lines, since the COVID-19 market crash had battered Coty's stock, leaving it at just $6.30 per share on March 12, 2020—well below its closing price on February 26.

**48.** Given that over 7 million shares changed hands on March 12 at prices that never cleared $7.00, it seems odd that Cottage Holdco decided to settle for buy-ing Laubies's 3,260,329 shares at $11.4937 per share—a market premium of more than 60%. It is especially odd since the whole point of the Initial Com-mon Stock Agreement's pricing formula was to key the sale price to the stock's contemporaneous market value.

**49.** Had Cottage Holdco simply insisted on recalculating the sale price over the 15 trading days ending on March 11 rather than February 26, it would have saved millions of dollars. Based on the stock's daily volume and closing prices during the later period, Plaintiffs estimate that the dollar volume-weighted average price would have dropped from $11.4937 per share to less than $9.50 per share.

**50.** That reduction would have knocked more than $6 million off the total price

Cottage Holdco paid for Laubies's shares.

**51.** Plaintiffs submit that Cottage Holdco did not bargain for this common sense reduction because the parties to the Initial Common Stock Agreement considered themselves bound to its material terms on February 27, 2020.

**52.** The truth is that the parties got it right the first time: Laubies and Cottage Holdco entered into the Initial Common Stock Agreement on February 27, 2020, because on that date the parties irrevocably committed to the material terms of the sale as evidenced by, among other things, Laubies' resignation on that date in reliance on the terms of the agreements, including the Initial Common Stock Agreement.

### Additional Disclosures in Coty's Motion to Dismiss

**53.** In support of its motion to dismiss, Coty filed an affidavit of Lauren A. Aguiar (the "Aguiar Affidavit") that disclosed additional documents that support Plaintiffs' allegation that the parties regarded the Initial Common Stock Agreement to have been binding on February 27, 2020, as originally reported.

**54.** Exhibit 6 to the Aguiar Affidavit contains a copy of the Schedule 13D/A filed by Cottage Holdco (and affiliates) on March 19, 2020. Attached as Exhibit E to the statement is a copy of the Amended Common Stock Agreement.

**55.** Exhibit 9 to the Aguiar Affidavit contains an email chain in which the parties discuss the precise wording of a tax indemnity clause for all three agreements to the effect that Laubies would indemnify the counterparty should it be required to pay any taxes that should properly be born by Laubies. The discussion does not indicate a disagreement about whether Laubies should bear the taxes: it is simply an effort to state his obligation in an appropriately worded manner.

**56.** The discussion also does not indicate any disagreement on the core terms of the agreement, namely the price or quantity of shares that are subject to the agreements.

**57.** Eight times in the email chain, proposed changes are referred to as "amendments" or its cognates: "I will amend the agreements accordingly", Docket Doc. 17-9 at 2; "two further amendments are necessary to the below text," *Id.* at 5; "Article 6 ⋯ will be amended as follows", *Id.* at 7; "my amendments are visible in black and bold", *Id.* at 8; "Article 5.2 of the Stock Purchase Agreement and the Series A-1 Preferred Repurchase Agreement will be amended as follows" *Id.*; "Article 6 of the [agreements] will be amended as follows", *Id.* at 9; "Article 19 of the Settlement Agreement will be amended as follows", *Id.*; and "Please provide me with amended documents", *Id.*

**58.** In a similar vein, the same email-chain refers twice to the "commercial deal" that was apparently already agreed to by the parties. *Id.* at 7.

**59.** Exhibit 10 to the Aguiar Affidavit contains an email to the effect that the sender had "attached the executed documents." Docket Doc. 17-10 at 2.

**60.** Paragraph 2 of the Amended Preferred Stock Agreement calls for the "Closing" to occur "as soon as reasonably practicable following the date hereof but in any event no later than March 9, 2020." *Id.* at 6.

**61.** Paragraph 2 of the Amended Common Stock Agreement likewise calls for the "Closing" to occur "as soon as reasonably practicable following the date hereof but in any event no later than March 9, 2020." *Id.* at 12.

**62.** In both cases, a closing date (i.e., March 9) that is required to occur before the date of the agreement (i.e., March 12) makes no sense, but makes eminent sense if the agreement date were actually February 27 as originally disclosed.

**63.** In the version of the Amended Common Stock Agreement attached to Cottage Holdco's Schedule 13D/A referred to in paragraph 54 above, paragraph 2, setting the closing date, significantly does not include the phrase "but in any event no later than March 9, 2020."

**64.** Under Delaware law, which the amended agreements state is to govern them, a written agreement for the sale or purchase of a security is not required:

> A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.

Delaware Uniform Commercial Code § 8–113.

**65.**   The disclosure in the original Forms 4 was correct in that it reflected at least an oral agreement sufficient under Delaware law, while the later amendments reflect, at best, amendments to agreements already entered into, the material terms of which were not in significant doubt.

SOLE CLAIM FOR RELIEF:
DISGORGEMENT UNDER 15 U.S.C. § 78P(B)
(AGAINST DEFENDANT PIERRE LAUBIES)

**66.**   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–65 above.

**67.**   Section 16(b) of the Securities Exchange Act of 1934, as amended, reads in pertinent part as follows:

> For the purpose of preventing the unfair use of information which may have been obtained by [a 10 percent] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.  Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same

thereafter; but no such suit shall be brought more than two years after the date such profit was realized.

15 U.S.C. § 78p(b).

**68.** At all relevant times, Laubies was an officer and director of Coty and, accordingly, was subject to Section 16 of the Act.

**69.** While subject to Section 16 of the Act, Laubies purchased 262,000 shares of Coty's Class A common stock at the price of $9.5418 per share as further described herein.

**70.** While subject to Section 16 of the Act, Laubies sold 3,260,329 shares of Coty's Class A common stock at the price of $11.4937 per share as further described herein.

**71.** The sale described in paragraph 70 above occurred within less than six months of the purchase described in paragraph 69 above.

**72.** The sale described in paragraph 70 above was made at a higher price than the purchase described in paragraph 69 above.

**73.** Laubies had a direct or indirect pecuniary interest in all of the shares of Coty's Class A common stock purchased and sold as described in paragraphs 69–70 above.

**74.** Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, Laubies realized a profit of $511,397.80, more or less, from the transactions described in paragraphs 69–70 above.

**75.** Under Section 16(b) of the Act, the profit realized by Laubies as described in paragraph 74 above inured to Coty and remains Coty's lawful property, recoverable by Plaintiffs in its stead, Coty having failed to seek recovery of the same despite Plaintiffs' due and timely demands.

### Demand for Jury Trial

Plaintiffs respectfully demand a trial by jury on all questions so triable.

### Prayer for Relief

Wherefore, Plaintiffs pray this Court for judgment:

(a) Requiring Defendant Pierre Laubies to account for and pay over to Coty the short-swing profit realized and retained by him in violation of Section 16(b) of the Act in an amount not less than $511,397.80, together with appropriate pre- and post-judgment interest and the costs of this suit;

(b) Awarding Plaintiffs their costs and disbursements including reasonable attorney's, accountant's, and expert witness fees; and

(c) Granting Plaintiffs such further relief as the Court deems just and proper.

Respectfully submitted,

2020-08-12

HUNTER & KMIEC                          MIRIAM TAUBER LAW PLLC

By: ⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯          By: ⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯
         /s/ James A. Hunter                         /s/ Miriam Tauber

    James A. Hunter                            Miriam Tauber
    HUNTER & KMIEC                             MIRIAM TAUBER LAW PLLC
    42 Stagecoach Rd.                          885 Park Avenue #2A
    Piper, PA 18947                            New York, NY 10075
    **Phone:** 484-437-5935                    **Phone:** 323-790-4881
    **Fax:** 646-462-3356                      **Email:** MiriamTauberLaw@gmail.com
    **Email:** hunter@hunterkmiec.com          **Bar:** MT-1979
    **Bar:** JH-1910                           *Attorney for Mark Rubenstein*
    *Attorney for Donna Ann Gabriele*
    *Chechele*

DE DOHERTY LAW OFFICE, LLC

By: ⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯
         /s/ Daniel E. Doherty

    Daniel E. Doherty
    DE DOHERTY LAW OFFICE, LLC
    7300 W. 110th Street, Suite 930
    Overland Park, KS 66210
    **Phone:** 913-338-7182
    **Fax:** 913-338-7164
    **Email:** ded@ddoherty.net
    **Bar:** DD–2145
    *Attorney for Revive Investing LLC*