UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONNA ANN GABRIELE CHECHELE, MARK
RUBENSTEIN, and REVIVE INVESTING, LLC,

                                    Plaintiffs,

                -v-

PIERRE LAUBIES,

                                    Defendant,

                                         – and –

COTY INC.,

                                    Nominal Defendant.

---

20 Civ. 3438 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiffs here are stockholders of nominal defendant Coty Inc. ("Coty") who seek to recoup on the company's behalf for "short-swing" profits they claim were unlawfully obtained in early 2020 by a corporate insider—Coty's chief executive officer.  They sue under section 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b).  Coty moves to dismiss plaintiffs' complaint or, in the alternative, for summary judgment.  For the following reasons, the Court denies the motion.

I.    **Background**

      A.    **Factual Background**[1]

            1.    **Parties**

Coty is a publicly traded beauty company which owns household name brands including Clairol and CoverGirl.  FAC ¶ 13.  Defendant Pierre Laubies ("Laubies") became Coty's CEO in

---

[1] This factual account draws from the First Amended Complaint, Dkt. 23 ("FAC").  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for

November 2018, and served in that role until June 1, 2020, when his resignation took effect.  *Id.* ¶ 15.  Between November 2018 and May 31, 2020, Laubies also sat on Coty's board.  *Id.*

On August 30, 2019, Laubies bought 262,000 shares of Coty's Class A common stock at $9.5418 per share.  *Id.* ¶ 16.  He reported this purchase on a Form 4—a Statement of Changes in Beneficial Ownership—filed with the SEC on September 4, 2019.  *Id.* ¶ 17.

### 2.   Laubies's, Coty's, and Cottage's March 2, 2020 Disclosures

In February 2020, Laubies announced to Coty's board that he planned to resign as CEO. *Id.* ¶ 18.  The FAC alleges that, "[i]n anticipation of his departure, Laubies resolved to liquidate his entire equity stake in Coty."  *Id.* ¶ 19.

On March 2, 2020, Laubies filed a Form 4 with the SEC which disclosed his sale of shares of Coty's Class A Common Stock to Cottage Holdco B.V. ("Cottage"), Coty's controlling stockholder.  *Id.* ¶¶ 21, 24.  The form stated that, "[o]n February 27, 2020, Cottage Holdco B.V. and Pierre Laubies entered into a stock purchase agreement pursuant to which Mr. Laubies agreed to sell, and Cottage Holdco B.V. agreed to purchase, 3,260,329 shares of Common Stock held by Mr. Laubies."  *Id.* ¶ 25.  The $11.4937 per-share price of this sale was derived from the "dollar volume-weighted average price of Coty's publicly traded Class A common stock on the New York Stock Exchange during the 15 consecutive trading days ending on February 26, 2020." *Id.* ¶ 22.  The same day, Cottage filed with the SEC its own Form 4 making a parallel disclosure: "On February 27, 2020, Cottage Holdco B.V. and Pierre Laubies entered into a stock purchase

---

failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

agreement pursuant to which Mr. Laubies agreed to sell, and Cottage Holdco B.V. agreed to purchase, 3,260,329 shares of Common Stock held by Mr. Laubies."  *Id.* ¶ 25.

On his March 2, 2020 Form 4, Laubies reported a second transaction: the sale of his shares of Series A-1 Preferred Stock to Coty, as to which he again listed February 27, 2020 as the transaction date.  *Id.* ¶¶ 28–29.  Laubies's Form 4 stated:

> On February 27, 2020, Coty Inc. (the "Company"), Mr. Laubies and Elmfort Invest B.V. entered into a purchase agreement pursuant to which Mr. Laubies and Elmfort Invest B.V. agreed to sell, and the Company agreed to purchase, all of the shares of Series A-1 Preferred Stock held directly and indirectly by Mr. Laubies.

*Id.* ¶ 29.  On a Form 8-K—used to report current events—Coty made a disclosure paralleling Laubies's:  "[O]n February 27, 2020, the Company entered into a purchase agreement (the 'Preferred Repurchase Agreement') with Mr. Laubies, pursuant to which the Company will purchase all of the shares of Series A-1 Preferred Stock held by Mr. Laubies."  *Id.* ¶ 30.

In that same 8-K, Coty disclosed that on February 27, 2020, it and Laubies had entered into an agreement as to the terms of Laubies's resignation:

> On February 27, 2020, Coty Management B.V. entered into a settlement agreement (the "Settlement Agreement") with Mr. Laubies in connection with his resignation. Pursuant to the Settlement Agreement, Mr. Laubies will receive the severance benefits provided for under his existing employment agreement as if his employment were terminated for Good Reason, so long as he provides a release and complies with the post-termination employment covenants contemplated by his employment agreement and the Settlement Agreement.

*Id.* ¶ 31.

On March 2, 2020, following the issuance of these forms, plaintiffs, in their capacities as Coty shareholders, sent demand letters to Coty to recover what they alleged was a short-swing profit that Laubies had realized from selling, on February 27, 2020, the 262,000 shares of Coty Class A common stock that he had bought on August 30, 2019, less than six months earlier.  *Id.* ¶ 33.

### 3.      March 16, 2020 Disclosures

On March 16, 2020, Laubies and Cottage each amended their earlier disclosures of the Common Stock transaction.  *Id.* ¶ 35.  Laubies filed an amended Form 4 in which he revised the date of his sale of common stock to Cottage from February 27 to March 12, 2020.  He stated: "The original Form 4 filed on March 2, 2020 is hereby amended by this Form 4/A to correct the transaction reported in Table I. . . .  This Form 4/A reflects that the Stock Purchase Agreement (as defined in this Form 4/A) was entered into on March 12, 2020."  *Id.* ¶ 36.  Cottage filed a parallel amended Form 4, stating: "The original Form 4 filed on March 2, 2020 is hereby amended and restated by this Form 4/A.  This Form 4/A reflects . . . that the Stock Purchase Agreement (as defined in this Form 4/A) was entered into on March 12, 2020."  *Id.* ¶ 40.  Neither amended Form 4 reported any change in the terms of the stock sale.  Each merely changed the reported date of the sale to a date two weeks later: March 12 rather than February 27.  *Id.* ¶ 37.

The per-share price that Laubies stood to receive from the sale of his Coty common stock to Cottage remained as originally reported: $11.4937 per share.  Between February 27 and March 12, however, the trading price of Coty common stock had dropped dramatically—along with much of the stock market—in the wake of the COVID-19 market crash.  Coty's stock on March 12, 2020 was listed as $6.30 per share.  *Id.* ¶ 47.

### 4.      Plaintiffs' Investigations

After the filing of the amended forms, plaintiffs questioned Coty's counsel about the change in the sale date reflected in the amended filings.  According to the FAC, Coty's counsel initially explained that inadvertently, the common stock agreement between Coty and Laubies had not been fully executed on February 27 because "Laubies had simply overlooked signing the

agreement in February," and that it was fully executed only later, accounting for the new March 12, 2020 date. *Id.* ¶ 42.

After plaintiffs' counsel pointed out the implausibility of that explanation, *id*. ¶ 43, Coty's counsel reviewed the issue within the company, and came forward with a new explanation for the change in the reported sale date: that "Laubies had deliberately withheld [the common stock agreement] for two weeks because he was unhappy with the draft terms of a tax indemnity Cottage Holdco had negotiated." *Id.*  ¶ 44.  Plaintiffs regarded that explanation as even more implausible, particularly insofar as it resulted in Cottage's buying Laubies's shares on March 12, 2020 at a 60% premium above their trading price. *Id*. ¶¶ 45–51.

In fact, plaintiffs concluded, the initially reported date of Laubies sale had been correct, and Laubies and Coty had transparently altered that reported date in their later filings to avoid liability for—and the compulsory disgorgement by Laubies of the profits received from—a sale by a corporate insider within six months of a stock purchase, in breach of section 16(b) of the Exchange Act. *Id*. ¶ 52.

### B. Procedural History

On May 2, 2020, plaintiffs filed their original complaint on behalf of Coty, suing Laubies and, as a nominal defendant, Coty.  Dkt. 1.  On July 17, 2020, Coty moved to dismiss the complaint, Dkt. 15, and filed a supporting declaration of counsel, Dkt. 17 ("Aguiar Decl.").

On July 23, 2020, the Court issued an order, which, *inter alia*, gave plaintiffs until August 13, 2020, to file any amended complaint in response to the motion.  Dkt. 20.  On August 13, 2020, plaintiffs filed the FAC.  FAC.  It brings one claim, under the Exchange Act.  It alleges that (1) because Laubies was an officer and director of Coty at all relevant times, he was subject to section 16 of the Exchange Act, which requires such "insiders" to disgorge to the

issuer any profit they realize from a purchase and sale of the issuer's equity securities occurring within a period of less than six months; (2) Laubies entered into an agreement to sell his Coty Class A common stock to Cottage on February 27, 2020, which, being less than six months from the date of his August 30, 2019 purchase of 262,000 shares of that stock, triggered section 16(b); and (3) the parties' revised Forms 4 falsely stated the date of the transaction as March 12, which fell outside the six-month period.  The FAC seeks Laubies's disgorgement under 15 U.S.C. § 78p(b) of his $511,397.80 profit on the purchase and sale of Coty's Class A common stock, plus an award of attorneys' fees and costs.

On September 28, 2020, Coty filed a motion to dismiss the FAC, or, in the alternative, for summary judgment, Dkt. 24, a supporting memorandum of law, Dkt. 25 ("Def. Mem."), a supporting declaration of counsel, Dkt. 26 ("Second Aguiar Decl."), and a Rule 56.1 Statement of facts in support of the motion, Dkt. 27.  It principally argues for dismissal under Federal Rule of Civil Procedure 12(b)(6) because the FAC lacks "plausible factual allegations" supporting that the actual date of the transaction was February 27, 2020, rather than March 12, 2020.  Def. Mem. at 2.  On September 28, 2020, Laubies filed a notice joining in Coty's motion.  Dkt. 28.  On November 12, 2020, plaintiffs filed an opposition.  Dkt. 29 ("Pl. Opp'n").  On December 11, 2020, Coty filed a reply, Dkt. 31 ("Reply"), which Laubies again joined, Dkt. 36.

## II.     Applicable Legal Principles

### A.     Section 16(b) of the Securities Exchange Act of 1934

Section 16 of the Exchange Act "was enacted to prevent corporate insiders from using non-public information to 'speculate in the stock of the corporations to which they owe a fiduciary duty.'"  *Donoghue v. Centillium Commc'ns, Inc.*, No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *2 (S.D.N.Y. Mar. 28, 2006) (quoting S. Rep. No. 73-1455, at 68 (1934)).  The

statute compels the "disgorgement to the company of any profit derived from the matching of any purchase and any sale of an 'equity security' (other than an exempted security) within a six-month period by a statutory insider." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998). Either the issuer or (as here) a shareholder acting derivatively on the issuer's behalf may bring a lawsuit under section 16(b). *Id.*

To establish liability under section 16(b), a plaintiff must prove "that there was (1) a purchase and (2) a sale of securities (3) by [an insider] (4) within a six-month period." *Id.* An insider is either (1) a beneficial owner of more than 10% of any class of non-exempt equity security, (2) a director of the issuer of any such security, or (3) an officer of the issuer. 15 U.S.C. § 78p(a)(1). As these elements reflect, section 16(b) imposes strict liability. It imposes a blanket ban on short-term trading by insiders without regard to whether the insider in fact had—or acted upon—inside information. *See Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 388–89 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020). The statute thus aims "to remove any temptation for insiders to engage in transactions which 'may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.'" *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998) (quoting *Kern Cnty. Land Co. v. Occidental Petrol. Corp.*, 411 U.S. 582, 594 (1973)). "No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement. Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Id.* at 320–21 (citation omitted).

The date for when liability attaches under section 16(b) is the date when the insider "incur[s] an irrevocable obligation" to purchase or sell shares for "precise consideration."

*DiLorenzo v. Murphy*, 443 F.3d 224, 229 (2d Cir. 2006); *see Prager v. Sylvestri*, 449 F. Supp. 425, 431 (S.D.N.Y. 1978) ("the critical moment in the initial 'purchase' or 'sale,' for the purpose of determining when that transaction occurred within the meaning of § 16(b), is that point at which the investor becomes irrevocably committed to the transaction").

### B.    Relevant Delaware Law

The parties agree that the agreements are governed by Delaware law.  Delaware law requires "the parties to have reached agreement on all material terms before an 'agreement to agree' will be enforced."  *Int'l Equity Cap. Growth Fund, L.P. v. Clegg*, No. Civ. A. 14995, 1997 WL 208955, at *9 n.3 (Del. Ch. Apr. 22, 1997).  Delaware law, however, does not require that a contract for the sale of a security be written to be enforceable.  *See* Delaware Uniform Commercial Code § 8-113 ("A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.").

### III.    Discussion

### A.    The FAC Plausibly Alleges the Elements of a Section 16(b) Claim

It is undisputed that Laubies, both as CEO and a board member, was an insider, and that he bought and then sold Coty securities.  The parties differ, however, as to the remaining element of liability under section 16(b): whether he bought and sold Coty's common stock securities "within a six-month period."  The only fact in dispute as to this element is whether the FAC plausibly pleads that Laubies's sale of the 262,000 shares of Coty common stock that he had bought on August 30, 2019 occurred on February 27, 2020 (giving rise to liability under section 16(b)) or on March 12, 2020 (outside the statutory six-month period).  In moving to dismiss,

defendants ask that the Form 4s reporting the earlier date be disregarded as inaccurate, and that the later Form 4s reporting the later sale be treated as correct. This question is not close. Plaintiffs have clearly plausibly pled that the sale occurred on February 27, 2020.

### 1.    Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### 2.    The Date of Laubies's Sale of Common Stock in Coty

Laubies originally reported, in his March 2, 2020 Form 4, that he had sold his shares of Coty's Class A Common Stock to Cottage on February 27, 2020. FAC ¶¶ 21, 24–25. The same day, Cottage—Coty's holding company—reported the same thing on its Form 4: that "[o]n February 27, 2020, Cottage Holdco B.V. and Pierre Laubies entered into a stock purchase agreement pursuant to which Mr. Laubies agreed to sell, and Cottage Holdco B.V. agreed to purchase, 3,260,329 shares of Class A Common Stock held by Mr. Laubies." *Id.* ¶ 27. Laubies's Form 4, and a Form 8-K filed by Coty, further disclosed that on February 27, 2020

they had also entered into separate agreements as to Laubies's sale of his preferred stock to Coty, *id.* ¶¶ 29–30, and as to Laubies's forthcoming resignation, *id.* ¶ 31 ("On February 27, 2020, Coty Management B.V. entered into a settlement agreement . . . with Mr. Laubies in connection with his resignation.").

These public filings by defendant Laubies, nominal defendant Coty, and Coty's holding company supply an eminently plausible—indeed, viewed in isolation, an all but dispositive—basis for treating the date of Laubies's agreement to sell his common shares to Cottage as February 27, 2020.  The Coty and Cottage Form 4s literally say so.  And the filings, including Coty's, viewed together, reflect a coherent and familiar narrative: that on February 27, 2020, outgoing CEO Laubies reached agreement with the company as to the full package of terms attendant to his resignation.

As pled, it was only after plaintiffs wrote Coty noting that the timing of the sale violated section 16(b) and demanding that Laubies disgorge his short-swing profits on the 262,000 shares of Coty common stock he had bought on August 30, 2019, and after Coty had forwarded this letter to Laubies's personal counsel, *id.* ¶¶ 33–34, that Coty and Cottage revised the date on which they claimed the common stock transaction had occurred.  To that effect, on March 16, 2020, Laubies filed an amended Form 4 moving the sale date two weeks later, to March 12, 2020, just outside of section 16(b)'s reach, *id.* ¶ 36, and Cottage filed a parallel amended Form 4, *id.* ¶ 40. Tellingly, these amended forms only revised the date of the agreement to sell Laubies's common stock.  They did not reflect any change in the quantity or price of the common stock that Laubies was selling to Cottage.  Nor did the revised Form 4s revise the dates of the other events that the public filings had situated on February 27, 2020: Laubies's sale of preferred stock to Coty, and

Laubies's settlement agreement with Coty as to the terms of his resignation.  These latter two events are not ones to which section 16(b) applies.

In seeking dismissal, defendants ask the Court to disregard the February 27 public filings and to treat the later ones as dispositive as to the common stock's sale date.  Defendants contend that plaintiffs have not met their "burden to plead a binding agreement" on February 27, 2020.  Reply at 3.  Defendants' argument is perilously close to frivolous.  Plaintiffs have easily met their pleading burden by citing Laubies's and Cottage's initial public filings on this point, which put the sale date on February 27, 2020, and by citing as corroborative Coty's filings, which placed on the same date the other agreements relating to Laubies's coming departure from the company.  Plaintiffs had every right to treat the initial round of public filings as accurate as to the true sale date.  Their theory, too, is eminently plausible that the later filings moving that date two weeks later to March 12 were false—a cover-up and an unusually transparent act of corporate CYA aimed at avoiding the between-the-eyes section 16(b) liability on Laubies' part that had been overlooked when Laubies agreed to sell his common stock within six months of purchase.  Plaintiffs' theory, too, is plausible that the reported sale date was moved later not because negotiations over material terms of Laubies's stock sale to Cottage remained open, but because Laubies had not alerted to his duty to disgorge his short-swing profits until plaintiffs wrote Coty and Coty then alerted Laubies, still its CEO, to the section 16(b) liability that the February 27 public filings effectively had announced.

Plaintiffs' pleadings are so strong on this point, in fact, that not only is the inference plausible that the sale date occurred on a date that would make Laubies liable for the violation of law alleged, *Iqbal*, 556 U.S. at 678—defendants' competing theory of a March 12, 2020 sale date pushes the limits of credulity.  To be sure, the fulsome and expeditious discovery that will now

ensue will provide the test of these competing claims.  And in fairness to defendants, the limited

facts cognizable on the pleadings inhibit their development of a competing narrative at this early

stage.  But the circumstantial inferences from the facts as pled make plaintiffs' account by far the

more plausible.

In particular, it is plausible that the common stock transaction, preferred stock

transaction, and the terms of the settlement agreement governing Laubies's resignation would

have been hammered out the same day, as originally announced.  It is plausible, albeit

dismaying, that, once his strict liability to disgorge the profits of a February 27 sale date was

drawn to CEO Laubies's attention, he and Cottage would publicly pretend that the sale date

occurred outside section 16(b)'s six-month period.  And, on the facts pled, it is implausible that a

sale agreement reached on March 12, 2020, would have maintained the $11.4937 per-share price

as initially reported on February 27, 2020.  That price was derived from the "dollar volume-

weighted average price of Coty's publicly traded Class A common stock on the New York Stock

Exchange during the 15 consecutive trading days ending on February 26, 2020."  FAC ¶ 22.  The

facts pled do not disclose a good reason to use that period as the measure of the sales price for a

sale reached on March 12.  The trading price of Coty common stock had plummeted between

February 27 and March 12, due to the onset of the COVID-19, pandemic, such that on March 12,

2020, the stock closed at $6.30 per share.  *Id.* ¶ 47.  A sale price of $11.4937 per share thus far

exceeded the stock's contemporaneous value.  Using the same formula (involving the stock's

average price during the preceding 15 days) that had been used as of February 27, the per-share

price would have been $9.50 per share, nearly 20% lower.  *Id.* ¶ 48.  On the pleadings, there is no

plausible explanation why Coty's holding company would vastly overpay Laubies for his shares

other than to heed an earlier agreement which now needed to be falsely postdated to safeguard

Laubies's profits from disgorgement.  Tellingly, too, the sale date was the only term of the sale as initially reported on February 27 that changed.

The FAC thus has, at a minimum, plausibly pled that, notwithstanding the revised sale date reported of March 12, 2020, the parties' irrevocable obligation under which Laubies would sell his shares to Cottage for a per-share price of $11.4937 occurred on February 27, 2020, exposing him to liability under section 16(b).

### 3.    Documents Attached by Defendants

In moving to dismiss plaintiffs' initial complaint, defendants submitted a declaration attaching various documents, which both parties treat as incorporated by reference in the later FAC, which addresses these materials explicitly.  See FAC ¶¶ 53–65.[2]  *See DiFolco*, 622 F.3d at 111 ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  But these attachments do not make plaintiffs' section 16(b) claim at all implausible.

Defendants first rely on what they term the "final, executed" common stock agreement, which they claim was executed on March 12, and which adds to the February 27 agreement two paragraphs relating to tax obligations.  *See* Aguiar Decl., Ex. 6 ("March 12 SPA"); Def. Mem. at 3.  These two paragraphs state:

> 5.2  All sums payable under this Agreement or for breach of any of the representations and warranties shall be paid free and clear of all deductions or withholdings whatsoever, save only as provided in this Agreement or as required by law.  Buyer shall not be obligated to pay any additional amounts to Seller as a result of any withholding taxes relating to the transactions contemplated hereby.

---

[2] The documents are attached, successively, to declarations by defense counsel Lauren E. Aguiar dated July 17, 2020, Dkt. 17, and September 28, Dkt. 24.  Although the attachments appear to be identical, the Court here cites to the first declaration, insofar as its attachments were the ones that the FAC referenced.

> 6. Tax Indemnity.  Any taxes relating to the transactions contemplated hereby, that according to the tax and/or social security legislation of the Netherlands and/or other applicable law are for the account of the Seller (whether directly or through a withholding by the Buyer), shall be borne by the Seller.  If such taxes are paid by Buyer or any of its affiliates (through a withholding tax or otherwise), the Seller shall promptly reimburse Buyer for such payment.  For the avoidance of doubt, the reimbursement obligation of the Seller will not apply to any other taxes, interests and/or penalties payable by Buyer in respect of the sums payable under this is Agreement.

March 12 SPA ¶¶ 5.2, 6.  Defendants argue that the addition of these paragraphs makes the February 27 agreement between Laubies and Cottage not final.

For multiple reasons, this document does not make plaintiffs' section 16(b) claim implausible.  For one, the FAC plausibly pleads that these paragraphs were not material additions to the agreements.  *See* FAC ¶ 55.  That question will be tested in discovery, which the Court expects will explore the facts and circumstances surrounding the addition of these paragraphs, including whether they were added to address consequential issues of authentic concern or whether they were prompted by plaintiffs' demand notice to Laubies and Coty of Laubies's section 16(b) violation.

Defendants next point to email correspondence, after the February 27 public filings, in which parties to the agreement and their counsel discuss and fine-tune the wording of these tax indemnity paragraphs.  *See, e.g.*, Aguiar Decl., Ex. 9 ("Email Chain").  But these discussions do not make the addition of these paragraphs material.  To state the obvious, it is very plausible that the entire exercise of modifying the February 27 agreement was a sham, with these modifications undertaken to support an argument, like defendants' here, that the February 27 agreement was not final.  Discovery will test the impetus for the modifications.

Beyond that, even assuming the modifications were not undertaken in an effort to avoid Laubies's unwelcome disgorgement obligation, the email chain on its face does not reveal extant

disagreement as to core terms of the common stock agreement.  It appears to be polishing wording to accommodate minor "amendments" to an understanding already reached as to the allocation of a tax obligation.  *See* Email Chain at 2 ("I will amend the agreements accordingly"); *id.* at 5 ("two further amendments are necessary to the below text"); *id.* at 5 ("Article 6 . . . will be amended as follows"); *id.* at 6 ("my amendments are visible in black and bold"); *id.* at 8 ("Article 5.2 of the [stock agreements] will be amended as follows"); *id.* at 9 ("Article 6 of the [stock agreements] will be amended as follows"); *id.* ("Article 19 of the Settlement Agreement will be amended as follows"); *id.* ("Please provide me with amended documents").  Insofar as Delaware law does not require a writing for a contract for a sale of a security to be binding, it is plausible that the parties reached agreement on tax terms, even if material, within the six-month window following Laubies's purchase, and indeed, by February 27, 2020, when the agreement was first announced.

Notably, too, the email correspondence reveals that similar modifications were made after February 27, 2020, to the tax provisions of the settlement agreement and the transaction of Laubies's preferred stock.  Despite the changes to these other two agreements, Coty and Laubies did not revise the transaction date of those agreements.  *See* Pl. Opp'n at 9–10; Email Chain. This, too, calls into question—requiring discovery—defendants' assertion that the modification of the written agreement's tax terms means it was reached at the later date they endorse.

Finally, defendants rely on Laubies's "executed signature page" of the agreement, noting that it was sent to Cottage's counsel on March 13, 2020.  Def. Mem. at 4; Aguiar Decl., Ex. 10 (email noting that the "executed documents" are attached).  This, too, fails to make implausible plaintiffs' claim that there had been an agreement as to Laubies's sale of his common stock as of February 27.  As noted, under Delaware law, a writing, let alone an executed signature page, is

not necessary for an agreement as to the sale of stock to be binding.  And the signature page, if anything, raises further questions about the coherence of Laubies's theory.  The version of the common stock agreement contained in that exhibit states that the "Closing" of the agreement "shall take place as soon as reasonably practicable following the date hereof but in any event no later than March 9, 2020."  Aguiar Decl., Ex. 10 at 12.  That deadline for the submission of an executed signature page does not cohere with defendants' claim that the agreement to sell stock first occurred on March 12, 2020.  It does, however, square with plaintiffs' theory—and the original Form 4 filings—that the agreement was reached on February 27, 2020.  *See* FAC ¶ 62.

Defendants' exhibits thus do not make implausible plaintiffs' claim of a section 16(b) violation.  On the contrary, in significant measure, they appear to fortify that claim.

### B.      Challenge to the Particularity of Plaintiffs' Pleadings

Defendants next argue that the heightened pleading standard for fraud-based claims under Rule 9(b) applies, and that the FAC does not meet this standard.  *See* Def. Mem. at 13; Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  Although the FAC does not contain the word "fraud," defendants argue that inasmuch as it alleges that the defendants applied a false date to the common-stock sale to free Laubies from disgorgement liability, the FAC implies fraudulent intent, triggering the heightened pleading standards.  Def. Mem. at 13 (citing *Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004) ("[T]he heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure applies to claims brought under Section 11 and Section 12(a)(2) of the Securities Act . . . when the claim sounds in fraud.")).

The short answer is that the FAC's allegations easily satisfy Rule 9(b)'s heightened pleading standard, such that it is unnecessary to determine whether the Rule applies.  Rule 9(b)

16

requires that claims sounding in fraud recite the "who, what, when, where, and how." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)); *see Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) ("Fed. R. Civ. P. 9(b) . . . requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." (quotations omitted)).  The FAC clearly pleads these ingredients.  The "who" is, at a minimum, Laubies; the "what" is a misstatement of the effective date of the common stock agreement; the "when" is March 16, 2020; the "how" is by filing a false amended Form 4 with the SEC; and the "why" is "to place the date of the common [stock sales and purchase agreement] beyond the reach of Section 16(b)'s six-month short-swing period," so as to preserve from disgorgement Laubies's $511,397.80 profit on the sale.  Pl. Opp'n at 21 (citing FAC ¶¶ 36, 41, 52).

The FAC thus satisfies Rule 9(b).  Indeed, the inference from the pleadings of fraudulent intent on the part of Laubies and others, and of the collusive submission of false public filings, is so strong as to raise more substantial questions.  These include whether the events at issue merit a referral for investigation to, *inter alia*, the SEC, and why Coty— rather than seeking to vindicate its shareholders' right to the recoupment of Laubies's alleged short-swing profits—is standing alongside Laubies in this litigation.  The Court expects to take up these questions with counsel in due course.

### C.      Defendants' Motion for Summary Judgment Is Premature

In a final bid to pretermit this litigation, defendants argue that if their motion to dismiss is not granted, summary judgment in their favor is warranted.  Def. Mem. at 14.  That argument is frivolous.

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  From time to time, courts have granted pre-discovery summary judgment where there is no information that could be further developed through discovery that would create a genuine issue of material fact.  *See, e.g.*, *DiLorenzo*, 443 F.3d at 226; *AmTrust N. Am., Inc. ex rel. Tech. Ins. Co., Inc. v. Signify Ins. Ltd.*, No. 18 Civ. 3779 (ER), 2020 WL 4226548, at *6 (S.D.N.Y. July 22, 2020) (granting pre-discovery summary judgment where the nonmovant failed to "indicate[] what additional discovery it would need to raise genuine issues of material fact as to any of these claims").

That is emphatically not the case here.  For the reasons reviewed above, the SAC raises a very substantial claim that Laubies's agreement to sell his common shares to Cottage was in place as of February 27, 2020, as both Laubies and Cottage represented in public filings. Defendants are at liberty to attempt to prove, as they submit, that the agreement was not reached until later.  But that determination certainly cannot be made on the pleadings, which instead provide ample reason to view that claim with skepticism.  The Court expects that, through thorough document and deposition discovery, a clearer portrait of the truth will come out.

## CONCLUSION

For the foregoing reasons, the Court denies defendant's motion to dismiss in its entirety. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 15 and 24.

18

The Court schedules an initial pretrial conference for April 16, 2021, at 12:30 p.m.  This conference will be held telephonically.  Counsel are directed to review the Court's Emergency Individual Rules and Practices in Light of COVID-19, found at https://nysd.uscourts.gov/hon-paul-engelmayer, for the Court's procedures for telephonic conferences.  Counsel are further directed to prepare a Civil Case Management Plan and joint letter in accordance with the Court's Individual Rules, to be submitted to the Court no later than April 12, 2021.  In light of the delay in the progress of this litigation occasioned by defendants' baseless motion to dismiss, the Court anticipates ordering expedited discovery, with fact discovery to be completed by the end of June 2021.  Counsel are to prepare a case management plan consistent with that deadline.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 16, 2021
       New York, New York